IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| NORTHWEST FEDERAL CREDIT UNION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:16cv1299(JCC/JFA) |
| ) | |
| SBC FINANCE, LLC, et al. ) | |
| ) | |
| Defendants. ) | |

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff Northwest Federal Credit Union's ("NWFCU") motion for a preliminary injunction regarding aid provided to Christopher Balestrino ("Balestrino") and Jason Bengert ("Bengert") by Defendants SBC Finance, LLC ("SBC Finance"), Gregory Gibson ("Greg Gibson" or "Gibson"), Christopher Banks ("Chris Banks" or "Banks"), and Janus 28, Inc. d/b/a Janus 28, LCC ("Janus") as Balestrino and Bengert allegedly violated restrictive covenants in their Asset Purchase and Employment Agreements.  Plaintiff alleges that Defendants have engaged in tortious interference with contract and conspiracy under Virginia law.  For the foregoing reasons, the Court will deny Plaintiff's motion for injunctive relief.

1

## I. Background

This case involves the domestic market for Small Business Administration ("SBA") and United States Department of Agriculture ("UDSA") government-guaranteed loans. To expand into this market, NWFCU purchased Park Place Equity, LLC ("PPE") in April 2014 for $8,000,000. Compl. ¶ 10; *see also* Pl. Mem. in Supp. at 1. Defendant Gibson was NWFCU's Chief Financial Officer at the time and "its lead draftsman and negotiator" for the agreements related to the PPE acquisition. Exhibit C, Affidavit of Gregory Gibson [Dkt. 23-3], ¶ 4. Defendant Banks represented PPE, acting as a broker for PPE and its managing members, PPE executives Chris Balestrino ("Balestrino") and Jason Bengert ("Bengert"). Exhibit B, Declaration of Chris Banks ("Exh. B, Banks Decl.") [Dkt. 23-2], ¶ 4. Due to Balestrino and Bengert's expertise in SBA and USDA loans, NWFCU retained them to lead the newly acquired division. *Id.*

Both the Asset Purchase Agreement and Employment Agreements for Balestrino and Bengert contained restrictive covenants affecting their ability to: (1) compete with NWFCU for a period of five years, regardless of whether they were still employed by NWFCU; (2) solicit customers or clients of NWFCU for a period of five years, regardless of whether they were still employed by NWFCU; and (3) hire former employees of NWFCU for a six-month period following their last date of employment at

NWFCU. Asset Purchase Agreement [Dkt. 1-1] at § 5.16; Employment Agreements [Dkt. 1-1] at § 6. The Employment Agreements also entitled Balestrino and Bengert to certain payments in the event that their employment was terminated with or without cause. Employment Agreements [Dkt. 1-1] at § 5(b). Additionally, the Agreements included an arbitration clause that states:

> Except as necessary for NWFCU and its subsidiaries, affiliates, successors or assigns or Executive to specifically enforce or enjoin a breach of this Agreement (to the extent such remedies are otherwise available), the parties agree that any and all disputes that may arise in connection with, arising out of or relating to this Agreement, or any dispute that relates in any way, in whole or in part, to Executive's services on behalf of NWFCU or any subsidiary, the termination of such services, or any dispute by and between the parties and their subsidiaries, affiliates, successors or assigns shall be submitted to binding arbitration.

*Id.* at § 9(k).

Defendants Gibson and Banks allege that in early 2016, NWFCU denied incentive compensation to Balestrino and Bengert that they were entitled to under their Employment Agreements. Exhibit D, Declaration of Chris Balestrino ("Exh. D, Balestrino Decl.") [Dkt. 23-4], ¶ 6. Thereafter, they gave notice to NWFCU that they had "Good Reason" to terminate their Employment


Agreements.  *Id.* ¶ 8.  Several days later, on May 9, 2016, NWFCU terminated Balestrino and Bengert.  Pl. Mem. in Supp. at 3.

Following their termination, Balestrino and Bengert filed an arbitration demand against NWFCU (the "Arbitration") seeking damages of more than $3 million.  Exh. D, Balestrino Decl. [Dkt. 23-4], ¶ 12.  NWFCU, represented by the same counsel, has answered that demand.  Def. Mem. in Opp. at 3.  In connection with these events, Defendants Gibson and Banks have signed sworn affidavits stating that NWFCU's failure to pay incentive compensation to Balestrino and Bengert violated their Employment Agreements.  Exhibit F, Affidavit of Chris Banks sworn April 28, 2016 [Dkt. 23-6]; Exh. C, Gibson Affidavit.  These affidavits, "representing both sides of the transaction through which NWFCU acquired PPE[,] . . . are of central importance to the pending Arbitration."  Def. Mem. in Opp. at 3; *see also* Exh. B, Banks Decl., ¶ 11.

As a result of Balestrino and Bengert's termination, NWFCU shifted all SBA and USDA lending back to its operations in Northern Virginia.  Pl. Mem. in Supp. at 3.  The parties dispute whether NWFCU remains in the SBA and USDA loan business today.  According to Defendants, NWFCU terminated all remaining employees and contractors in the PPE division and is, therefore, no longer actively participating in the market.  Def. Mem. in Opp. at 3.  Plaintiff asserts in its reply that it is "carefully

rebuilding its SBA and USDA lending program." Pl. Rep. in Supp. at 5.

On May 11, 2016, Defendant SBC Finance was formed. Pl. Mem. in Supp. at 3. Plaintiff alleges that Balestrino and Bengert are owners, consultants, employees, or otherwise affiliated with SBC Finance. *Id*. However, Defendants maintain that SBC Finance's sole managing member is Fredrick Matson Kelley ("Kelley"). Exhibit G, Declaration of Fredrick Mason Kelley ("Exh. G, Kelley Decl."), ¶ 10. Plaintiff alleges that Kelley is a "straw owner" for Balestrino and Bengert, citing emails that were inadvertently sent to its system involving notifications from SBC Finance's registered agent, communication between Bengert and Kelley regarding a laptop purchase for Bengert, and financial payments in the amount of $30,000 from Balestrino and Bengert to SBC Finance as proof of at least an affiliation between the three Defendants. Pl. Rep. in Supp. at 1-2.

Plaintiff also alleges that Defendants Banks and Gibson worked with Balestrino and Bengert to market SBC Finance for sale to a financial institution. Pl. Mem. in Supp. at 4. While Defendant Banks acknowledges that he created a draft marketing presentation for Balestrino and Bengert to market their SBA and USDA loan expertise, he claims that the draft presentation's inclusion of SBC Finance and Defendant Gibson

were both mistakes. Exh. B, Banks Decl., ¶¶ 6-8. The draft presentation also included Defendant Janus's name; Banks claims he was considering working with that entity. *Id.* ¶ 8. Defendants contend that Gibson, Banks, and Janus are not owners, consultants, or active participants in SBC Finance. Def. Mem. in Opp. at 4. Plaintiff contests the characterization of the relationship between the four Defendants and continues to assert that the business plan was "obviously specific" to SBC Finance. Pl. Rep. in Supp. at 3.

Finally, Plaintiff alleges that SBC Finance has hired former NWFCU employees, targeted NWFCU SBA and USDA loans for refinancing, and followed up on lending opportunities that were initially developed while Balestrino and Bengert were employed at NWFCU. Pl. Mem. in Supp. at 4. Defendants admit that, having been terminated without cause, several former members of the PPE division at NWFCU now work for SBC Finance. Def. Mem. in Opp. at 4. However, they also clarify that none of these former PPE division employees are restricted from competing with NWFCU, as Balestrino and Bengert are. *Id.* at 3.

On July 10, 2016, NWFCU commenced a related case against JBCB Investments, LLC ("JBCB"), an entity owned by Balestrino and Bengert, alleging that JBCB had converted and been unjustly enriched as the result of a payment from NWFCU. *See* Exhibit H, Related Case Docket Report [Dkt. 23-8]; Exhibit

6

I, Related Case Complaint [Dkt. 23-9]. Following JBCB's motion, on October 3, 2016, Judge O'Grady stayed the case pending arbitration. *See* Exhibit A, Related Case Order [Dkt. 23-1]. Less than two weeks later, NWFCU commenced this action.

Plaintiff NWFCU is a credit union formed under the National Credit Union Act and headquartered in Herndon, Virginia. Compl. ¶ 1. Defendant SBC Finance is a Nevada limited liability corporation with its principal place of business in Arizona. *Id.* ¶ 2. Defendant Janus is a corporation formed and registered to do business in South Carolina. *Id.* ¶ 5. Defendant Gibson is alleged to be working full-time at a credit union in Georgia. *Id.* ¶ 3. Defendant Banks is alleged to reside in Georgia. *Id.* ¶ 4.

On October 13, 2016, Plaintiff filed the present lawsuit seeking injunctive relief and damages pursuant to Virginia law, including tortious interference with contract and conspiracy. This motion is now before the Court, and the matter is ripe for disposition.

## II.  Standard of Review

The party seeking a preliminary injunction must demonstrate that: (1) it is likely to suffer irreparable harm; (2) it is likely to succeed on the merits; (3) the balance of hardships tips in its favor; and (4) the injunction is in the public interest. *The Real Truth About Obama, Inc. v. FEC*, 575

F.3d 342, 346-47 (4th Cir. 2009). All four factors must be satisfied for the plaintiff to receive injunctive relief. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 250 (4th Cir. 2014).

### III. Analysis

A. <u>Irreparable Harm</u>

The plaintiff must first "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama*, 575 F.3d at 347. Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and citation omitted). Moreover, "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Comm. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

In this case, Plaintiff contends that, due to Defendants' actions, NWFCU is actively losing customers to SBC Finance. Pl. Mem. in Supp. at 5. To date, Plaintiff has identified five major loans that originated with NWFCU's PPE Division that SBC Finance has been involved in refinancing since Balestrino and Bengert were terminated, resulting in the loss of $4,930,745.55. *Id.* at 6-7. Plaintiff argues that SBC Finance's

activities will result in the permanent loss of customers. *Id.* at 6. At the same time, Plaintiff states that damages "will be quantifiable in the form of lost profits due to interest income on loans refinanced by SBC Finance, lost profits due to fee income not attributed to NWFCU, and lending opportunities lost to SBC Finance in the SBA and USDA lending market." Pl. Mem. in Supp. at 9. In other words, there is nothing in the record to suggest that damages would be difficult to ascertain. Thus, Plaintiff has failed to establish that it is likely to suffer irreparable harm.

B.  Likelihood of Success on the Merits

A plaintiff must also make a "clear showing" that it is likely to succeed on the merits of at least one of its claims at trial. *Real Truth About Obama*, 575 F.3d at 345. Because the Court concludes that Plaintiff has not made such a showing with regards to its tortious interference claim, the Court does not address its conspiracy claims, as both claims are based upon the same underlying contract.[1]

In order to state a claim for tortious interference with contract under Virginia law, the plaintiff must establish: (1) the existence of a valid contract; (2) knowledge of it on

---

[1] In conducting its analysis to rule on the Motion for Preliminary Injunction, the Court clarifies that its findings on the interpretation and enforceability of the Employment Agreements are not binding on the Arbitration proceedings already underway.

the part of the interferor; (3) intentional interference; and (4) damage to the party whose relationship has been disrupted. *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214-15 (2014).

        1.      *Existence of a Valid Contract*

The first element of tortious interference involves the existence of a valid contract. In the Commonwealth of Virginia, "[a] non-competition agreement between an employer and an employee will be enforced if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va. 246, 249 (2005) (citing *Modern Env'ts, Inc. v. Stinnett,* 263 Va. 491, 493 (2002); *Simmons v. Miller,* 261 Va. 561, 580–81 (2001)). The employer bears the burden of proof. *Modern Env'ts,* 263 Va. at 493. Virginia law focuses the analysis of this interrelated inquiry on the "function, geographic scope, and duration" of the restriction. *Home Paramount Pest Control Companies, Inc. v. Shaffer*, 282 Va. 412, 415-16 (2011). These elements are "considered together," rather than "as three separate and distinct issues." *Id.*

Plaintiff argues that the restrictive covenants in the Asset Purchase Agreement and the Employment Agreements are valid

and enforceable. However, Plaintiff provides little evidence or reasoning to support this conclusion. Plaintiff does make clear that the provisions are limited to five years; restrict Balestrino and Bengert from competing with NWFCU where NWFCU conducts business or has proposed, in writing, to conduct business at the time of closing; and include commercial lending in the definition of a "Competing Business" in the Asset Purchase Agreement only. Pl. Mem. in Supp. at 8. Plaintiff alleges that these provisions are narrowly drawn to protect its legitimate business interests. *Id.* NWFCU cites in support of its argument the fact that Balestrino and Bengert agreed that the non-competition provisions were fair and enforceable at the time each signed, as well as that the intent of the provisions was to prevent them from setting up a competing business after selling PPE to NWFCU for millions of dollars. *Id.* at 8-9.

The Court finds Plaintiff's arguments unconvincing. The restrictive covenants at issue here both involve a duration of five years. The Supreme Court of Virginia has previously found restrictive covenants of three years to be unreasonable, depending on the facts of a particular case. *See Simmons v. Miller*, 261 Va. 561, 581 (2001) (striking down a three-year restriction because it was broader than the company's specific business activity and had no geographical limitation); *but see Blue Ridge Anesthesia v. Gidick*, 239 Va. 369, 374 (1990)

11

(upholding a three-year restriction because it was limited to the former employees' respective territories and the anesthesia and critical care business). The function of the restrictions at issue here is also overly broad. By its terms, the non-competition provisions prevent Balestrino and Bengert from working "in any . . . individual or representative capacity . . . in any manner or fashion in any credit union, bank, lender, or mortgage broker that competes in any manner whatsoever with NWFCU." Employment Agreements [Dkt. 8-1 at 83], § 6(a). This restriction suggests that Balestrino and Bengert could not work for a competitor in *any* role, even one that does not directly use their expertise in SBA and USDA loans and/or knowledge of NWFCU. *See Home Paramount*, 282 Va. at 416-19. Plaintiff fails to offer any argument or evidence of a legitimate business interest that would be served by prohibiting Balestrino and Bengert from being employed in any capacity by a competing financial institution, aside from a single assertion that the provisions were negotiated to prevent Balestrino and Bengert from setting up a competing business. While that may be true, the language of the non-competition provisions accomplishes far more. Finally, the covenants in this case fail to define clearly the restricted geographic area. The Court is left to presume where NWFCU's conducts its business, or has proposed to

do so at the time of closing the PPE sale.  As a result, the geographic limitation is overly broad.

Taken together, Plaintiff has failed to carry its burden of showing that the restrictive covenant is reasonable and no greater than necessary to protect a legitimate business interest.  The Court finds that Plaintiff is unlikely to succeed in establishing the existence of a valid contract.

    2.    *Knowledge on the Part of Interferor(s)*

The second element of tortious interference involves knowledge on the part of the interferor(s).  Both parties agree that Defendants Gibson and Banks had knowledge of the restrictive covenants in Balestrino and Bengert's Employment Agreements.  Thus, the Court finds that Plaintiff is likely to be able to establish that these two interferors had knowledge of the underlying agreement.  However, Plaintiff has failed to establish that Janus and SBC Finance had such knowledge.  Other than bare allegations that both Defendants Gibson and Banks were principals of Janus, which remains in dispute, Plaintiff offers no evidence of Janus's involvement in the sale of PPE to NWFCU.  Similarly, Plaintiff has failed to provide sufficient evidence that Defendant SBC Finance was formed, or is currently operated by, Gibson, Banks, Balestrino, or Bengert.  At most, Plaintiff provides evidence of some affiliation between Kelley and Bengert.  But it is not clear that this affiliation would be

enough to impute Bengert's knowledge of the Employment Agreements to SBC Finance. Plaintiff has failed to meet its burden of proving knowledge on the part of Defendants Janus and SBC Finance and, thus, is unlikely to succeed on the merits.

       3.      *Intentional Interference*

The third element of tortious interference involves intentional interference with the underlying agreement. Plaintiff argues that Defendants Gibson and Banks intentionally interfered with the restrictive covenants in Balestrino and Bengert's Employment Agreements. Pl. Mem. in Supp. at 9. The Complaint alleges that both Defendants helped to form SBC Finance, two days after Balestrino and Bengert's employment with NWFCU ended. Compl. ¶¶ 29-30. Defendants also allegedly created a business plan for SBC Finance. Pl. Mem. in Supp. at 7. Based upon emails inadvertently sent to Balestrino and Bengert at their former NWFCU email addresses, Plaintiff believes they are operating SBC Finance together. *Id.* Furthermore, Plaintiff asserts that SBC Finance is in direct competition with NWFCU. Compl. ¶ 36. Any support provided to SBC Finance would therefore intentionally interfere with the restrictive covenants Balestrino and Bengert signed. *Id.* ¶ 48.

Defendants argue that Plaintiff's arguments are based on a series of false assumptions. They contend that Balestrino and Bengert are not owners or employees of SBC Finance and have

never been compensated by SBC Finance.  Exh. G, Kelley Decl. [Dkt. 23-7], ¶¶ 4, 9.  Moreover, the actual Defendants here (Gibson, Banks, and Janus) are also not active participants, consultants, or owners of SBC Finance.  *Id*. ¶¶ 4, 6, 8.  Gibson likewise has no connection to Defendant Janus.  Exhibit J, Affidavit of Jon D. Heard ("Exh. J, Heard Affidavit") [Dkt. 23-10].  Defendants argue that the absence of any connection between SBC Finance and Gibson, Banks, and Janus means "that NWFCU will not be able to show interference by the Defendants with the restrictive covenants."  Def. Mem. in Opp. at 9-10.

In the instant case, key facts remain in dispute.  Accordingly, the Court finds that there is not sufficient evidence to suggest that Plaintiff would prevail on the third element of its claim, intentional interference.

    4.  *Damages*

The last factor involves damages.  Plaintiff estimates that it has already lost nearly $5 million in profits due to SBC Finance's activities.  Pl. Mem. in Supp. at 5-6.  Additional damages have not yet been determined, as Plaintiff has not been able to discover the extent of SBC Finance's competitive activities.  *Id.* at 9.  However, damages will be quantifiable in the form of lost profits.  *Id.*  Thus, the fourth element of tortious interference with a contract is satisfied.

15

In summary, the Court concludes that Plaintiff's claim of tortious interference with contract is unlikely to succeed on the merits due to an absence of proper argument and evidence to establish the validity and enforceability of the restrictive covenants, knowledge on the part of Defendants Janus and SBC Finance, and intentional interference.

C.        Balance of the Equities

To grant a preliminary injunction, Plaintiff must establish that the equities tip in its favor. *The Real Truth About Obama*, 575 F.3d at 346. Plaintiff seeks a preliminary injunction to maintain the status quo and restrain Defendants, and specifically SBC Finance, from helping Balestrino and Bengert to violate the restrictive covenants in their Employment Agreements. Plaintiff argues that continued interference with Balestrino and Bengert's covenants has a clear risk of harming Plaintiff with "no harm" to Defendants.

Defendants argue that granting a preliminary injunction will inflict greater harm than denying it. A blanket prohibition on communication between SBC Finance and any borrower who has or had begun applying for an SBA or USDA loan as of May 9, 2016 would prevent independent contractors currently working with SBC Finance from continuing to do so. Def. Mem. in Opp. at 11. Such a result would be unjust because these contractors are not subject to the restrictive covenants

with NWFCU that Balestrino and Bengert signed. *Id.* Moreover, NWFCU seeks to prevent Defendants Banks and Gibson from communicating with Balestrino and Bengert regarding NWFCU. This relief "would prohibit them from communicating about, and preparing for, the pending Arbitration." *Id.* Plaintiff responded to Defendants' concerns by more narrowly defining the injunctive relief it seeks.

After weighing the equities, the Court finds that the potential harm to Defendants outweighs the potential harm to Plaintiff. Consequently, the equities tip in favor of denying the Plaintiffs' request for injunctive relief.

D.      Public Interest

Finally, the public interest does not favor issuing the injunction sought. Plaintiff alleges that Defendants have conspired to establish a new, competing business that Balestrino and Bengert operate, with former NWFCU employees, to target NWFCU's borrowers. Pl. Mem. in Supp. at 9. Such activity is alleged to threaten NWFCU's business interests, and to be in direct violation of restrictive covenants Balestrino and Bengert signed. *Id.* Plaintiff argues that "the public has an interest in enforcing restrictive covenants that protect business interests." *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005).

17

Defendants put forth a competing public interest. They argue that "[t]here is a strong federal policy favoring arbitration." *UBS Fin. Servs. Inc. v. Carilion Clinic*, 880 F. Supp. 2d 724, 734 (E.D. Va. 2012). Issuing a preliminary injunction in this case would forbid communication between the parties regarding the pending Arbitration. Moreover, Defendants point out that this Court has already found that NWFCU agreed to arbitration, *see* Exh. A, Related Case Order, and "public policy favors giving effect to the parties' intent by allowing arbitration to proceed." *UBS Fin. Serv.*, 880 F. Supp. 2d at 734. Defendants also argue that continuing this litigation would waste judicial resources and could lead to inconsistent results with Arbitration. The Court agrees. Accordingly, the Court finds that the public interest factor weighs against granting a preliminary injunction.

\*   \*   \*

In conclusion, Plaintiff has failed to demonstrate that it is entitled to an order preliminarily enjoining Defendants from further communication, directly or indirectly with Balestrino and Bengert or their agents, about SBA or USDA loans or NWFCU. Plaintiff also has not demonstrated it is entitled to an order enjoining Defendants from communicating, directly or indirectly, with any borrower who discussed applying

for an SBA or USDA loan with NWFCU as of May 9, 2016.  The Court denies Plaintiff's motion for a preliminary injunction.

## IV.   Conclusion

For the foregoing reasons, the Court will deny Plaintiff's motion for preliminary injunction.  An appropriate Order shall issue.

```
                                              /s/
October 27, 2016                       James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE
```